2025 IL App (2d) 250123-U
No. 2-25-0123
Order filed June 25, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No.   24-CF-2108 |
| | ) | |
| DANIEL D. ROBINSON, | ) | Honorable |
| | ) | David P. Kliment, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Presiding Justice Kennedy concurred in the judgment.
Justice McLaren specially concurred.

**ORDER**

¶ 1    *Held*: Trial court's detention decision reversed, where there was no evidence that conditions short of detention could not mitigate any alleged threat, particularly where defendant had no criminal history or other history reflecting that he would not abide by conditions of pretrial release.   Reversed and remanded.

¶ 2    Defendant, Daniel D. Robinson, appeals from the trial court's order denying his pretrial

release under article 110 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/art. 110

(West 2022)), as amended by Public Act 101-652 (eff. Jan. 1, 2023).   See Pub. Act 102-1104, §

70 (eff. Jan. 1, 2023) (amending various provisions of Public Act 101-652); *Rowe v. Raoul*, 2023

IL 129248, ¶ 52 (lifting stay and setting effective date as September 18, 2023). For the following reasons, we reverse and remand.

¶ 3                                    I. BACKGROUND

¶ 4                         A. Charges and Petition to Detain

¶ 5     On September 26, 2024, an arrest warrant issued and defendant was charged with three counts of first degree murder (720 ILCS 5/9-1(a)(1)-(3) (West 2022)), attempted first degree murder (*id.* §§ 5/8-4(a), 5/9-1(a)(1)), attempted armed robbery with a firearm (*id.* §§ 5/8-4(a), 5/18-2(a)(2)), and possession of a firearm without a firearm owner's identification card (430 ILCS 65/2(a)(1) (West 2022)). The charges stemmed from an incident that took place on August 20, 2023, when defendant was age 17, although he was age 18 when charged.

¶ 6     The arrest warrant was served on December 4, 2024. The next day, on December 5, 2024, the State petitioned to deny defendant pretrial release, alleging that he was charged with detainable offenses and his pretrial release posed a real and present threat to community safety. 725 ILCS 5/110-6.1(a)(1), (a)(1.5), (a)(7) (West 2022). At defendant's request, a hearing on the petition was continued to December 6, 2024. The court ordered defendant detained, pending a hearing on the petition.

¶ 7     On December 6 and December 9, 2024, defendant again moved to continue the case, and the court order on December 6 advised "[a]ll clocks tolled until next date."

¶ 8     On December 19, 2024, and January 3, 2025, the case was continued by agreement. Defendant remained detained "for the reasons stated on the record," although there is no transcript from those dates in the record on appeal.

¶ 9    On February 7, 2025, defendant moved for another continuance and the case was set for hearing on February 19, 2025.   The written order reflected that "[a]ll clocks tolled" and that defendant remained detained.

¶ 10                    B. Petition-to-Detain Hearing and Ruling

¶ 11    On February 19, 2025, the court held a hearing on the State's petition to detain defendant. The State introduced into evidence a police synopsis and an Aurora police department incident supplemental report.   According to the synopsis, on August 20, 2023, officers arrived at 1321 North Glen Circle in Aurora, in response to a 911 call reporting gunshots.   When they arrived, Edwin Varela-Santos was seated in the driver's seat of a vehicle, suffering from gunshot wounds, and he ultimately died after arriving at the hospital.    His girlfriend, Samantha Campos, was seated in the front passenger seat of the vehicle.   Campos related that, on their way to dinner, Varela-Santos said he needed to drop something off.    He did not say what it was, but Campos knew that Varela-Santos sold illegal drugs, and she believed he was dropping off cannabis.   When they arrived at 1321 North Glen Circle, Varela-Santos conversed about money and a cash application on his phone with a Hispanic male whom Campos believed was named "Moe."    Varela-Santos and "Moe" had a disagreement about the transaction not working.   While the conversation took place, Campos saw a black male appear with a handgun.   Varela-Santos reversed the vehicle to exit the area, but shots were fired into the open window, striking Varela-Santos.

¶ 12    Video surveillance recovered from 1372 South Glen Circle showed four individuals walking into the relevant area.   The four individuals (all between ages 14 to 18) were later identified as defendant, Zahmir Andrews, Lavonti Jones, and Isaiah Martinez.   According to the synopsis, the man seen firing a handgun into the car was later identified as Andrews (although the police synopsis is inconsistent and, at one point, suggests the shooter was Jones).   The Hispanic

male whom Campos described as having conversed with Varela-Santos was believed to be Martinez. A search of a messaging application on Varela-Santos's phone, called "Telegram," uncovered a conversation between him and "Moe," wherein Moe discussed purchasing cannabis from Varela-Santos, sent a short video identifying himself, and directed Varela-Santos to 1320 North Glen Circle.

¶ 13 According to the synopsis, after Jones was taken into custody, he (1) identified defendant as one of the males seen in the surveillance video; (2) stated that he initially thought they were going to purchase cannabis, but learned from defendant that they were going to rob Varela-Santos by use of a firearm; and (3) stated that defendant brought the firearm and handed it to Andrews, who then shot Varela-Santos.

¶ 14 The supplemental incident report reflected that, on August 25, 2023, an officer reviewed jail phone calls made by arrestees Jones, Andrews, and Martinez. The officer wrote that the report was a "summary of each call *** and should not be interpreted verbatim unless otherwise indicated." As relevant here, Jones related in his calls that he was with "Zahmir, Daniel [*i.e.*, presumably defendant], and Isaiah" during the incident. He was emotional and concerned that, if he did not say anything, he would be charged with murder and robbery, and the other person on the call encouraged him to "talk and tell on them." Jones stated, "I don't know why Daniel gave it to him" and confirmed that "Daniel" had "it." Additional calls reflected that a gun was found in Andrews' room.

¶ 15 The State argued that the exhibits reflected that defendant committed the charged offenses. Further, it argued that defendant posed a real and present threat to "anybody working in the cannabis trade," as defendant planned an armed robbery and provided the firearm, despite being under age 21 and not eligible to own or possess a firearm, all of which reflected premeditation.

In addition, the State argued that defendant was a danger to Campos, who was in the vehicle and was a witness. Similarly, the State contended that defendant was a danger to "the other codefendant who has made statements to the police," who was also a witness.

¶ 16 Finally, the State argued that no conditions would mitigate the threat that defendant posed to the community. It noted that, at the time of the charged offenses, defendant was living in the same situation in which he would be living if released. The State noted that electronic home monitoring (EHM) would not keep defendant in any one location, given that he would have two days he could "come and go as he pleases." It reiterated that defendant was not 21 years old and could not legally possess a firearm, knew he could not legally possess a firearm, and yet possessed the gun used to kill the victim.

¶ 17 In response, as to commission of the offenses, defense counsel noted that the State alleged that a firearm was used by someone else. Further, the allegation that defendant provided the firearm was based solely on the word of a codefendant who had something to gain by shifting blame away from himself. Moreover, the weapon itself was found in the shooter's home, not defendant's. Counsel noted that, in addition to defendant and the shooter, it appeared that the third and possibly fourth codefendants were no longer in custody.

¶ 18 Counsel also argued that clear and convincing evidence of dangerousness could not be based solely on the charged offense, and, here, there was no evidence reflecting that defendant had any criminal history. Further, counsel argued, defendant was not a "real and present threat," where the alleged offense took place on August 20, 2023, the charges were filed and an arrest warrant issued on September 26, 2024, and the file was unsealed on December 5, 2024, yet, since the date of the offense, there were no allegations or evidence that defendant engaged in any threats, coercion, or harassment of any witness or anyone in the community, nor any allegations involving

weapons, possession of weapons, or any other such activity. Counsel noted that defendant lived with his mother and younger sibling and had other family in the community, had been working since the date of the offense, and was working toward obtaining his GED, needing only to take the test. Counsel further noted that, having had no criminal history, defendant was not on probation or parole at the time of the alleged offense, and there was no evidence of any other history of violence or psychological issues. Counsel also pointed out that there were no statements attributed to defendant regarding the offense.

¶ 19    Finally, counsel argued that conditions short of detention were available and appropriate to mitigate any alleged danger, such as ordering defendant to: possess no weapons; appear at all court dates and comply with any other court orders; have no contact with any witnesses or codefendants; continue his employment and/or education, if possible, based on the terms of release; report to pretrial services at the level outlined in the pretrial release safety report; and commit no additional offenses. If the foregoing were insufficient, counsel asserted, EHM could be a condition, as defendant had a home in the community. Defendant also offered into evidence a compilation of approximately 11 letters, reflecting support from people in the community, including from his employer, regarding his personality, character, and work ethic.

¶ 20    The State replied that the conditions defendant suggested already existed at the time of this offense, and the fact that he brought a weapon that he was legally prohibited from possessing reflected that defendant would continue to do whatever he wanted and conditions would not work. Further, the State argued, the fact that defendant committed an armed robbery for a small amount of cannabis, despite having a job, suggested that he was purely out for profit and spoke to dangerousness. The State noted that the court had no evidence regarding the custody of the codefendants. Finally, the State argued that the fact that defendant was not a threat to anyone

between the date of the offense and the day he was arrested was because he "thought he got away with it.   Now that he's been arrested and now that he knows that he's been charged and now he knows who the witnesses are *** certainly that is where the danger exists and that is why there is no set of conditions that could mitigate the danger to the community or to the specific witnesses."

¶ 21     On February 19, 2025, the court granted the State's petition.   The court found the proof was evident and presumption great that defendant committed the detainable offenses.    Further, it noted that it had considered the statutory factors for determining dangerousness (725 ILCS 5/110-6.1(g) (West 2022)), including the nature and circumstances of the offense.    The court found that defendant posed a real and present threat to the public at large, given the offense was "seemingly random in nature to find someone to rob and attempt to do so," as well as to Campos, a potential witness in the case.    As to the factor whether defendant was known to possess or have access to weapons, the court noted that it was alleged that defendant provided the weapon in this case. Finally, as to least-restrictive conditions, the court found that EHM and GPS would do nothing to protect potential witnesses or the public at large and were ineffective "in cases like this where the defendant can still go out and do whatever he wants to do and law enforcement won't learn anything about it until after the fact."    Thus, the court found there were no conditions other than detention that could protect the public and witnesses.

¶ 22                                C. Motion for Relief and Ruling

¶ 23     Defendant moved for relief, arguing that the court erred in granting the State's petition. In sum, defendant argued first that, due to the unreliability of the sole source of individualized allegations against defendant, the court erred in finding that the State satisfied its burden to prove by clear and convincing evidence that he committed the charged offenses.    Namely, the allegation came from a codefendant deflecting blame from himself and, by pointing at defendant, diminishing

- 7 -

his own involvement. "No other or corroborating evidence was proffered connecting [defendant] specifically to a firearm."

¶ 24    Second, defendant argued that the State failed to meet its burden to establish that he posed a real and present threat to community safety. He noted that a determination of dangerousness is speculative, and the legislature intended that every person charged be eligible for an opportunity to be released with conditions. Here, he asserted, he had offered numerous character letters to the court, and proffered evidence about his employment, educational aspirations, and close ties to the community. Further, defendant argued, there was no evidence that he was a real and present threat, where there were no allegations that, since the date of the offense in 2023, he had engaged in any criminal conduct or contacted and/or attempted to contact any witnesses.

¶ 25    Finally, defendant argued that the State failed to meet its burden of proving that no conditions could mitigate any real and present threat he allegedly posed. Defendant noted that no evidence was presented of any prior criminal history or failure to comply with court orders. Further, although the court had found that EHM and GPS would be ineffective and public safety would be best protected by detention, defendant asserted that the statute's goal is to mitigate, not eliminate, a threat. Defendant argued that the court failed to properly consider his lack of criminal history, stable residence in the community (and long-term residence with family), employment, and schooling.

¶ 26    On March 21, 2025, the court heard argument on defendant's motion. At that time, defense counsel referred the court to defendant's written motion, but reiterated, as to dangerousness, that *People v. Riaz*, 2023 IL App (1st) 231833, ¶ 25, reflected that the court should consider the length of time that defendant had no contact with law enforcement or any individual that the State claimed was at risk. Relatedly, as to the State's suggestion that those circumstances

have changed because defendant has now been charged, *People v. Martinez*, 2025 IL App (2d) 240712-U, ¶¶ 23-24, considered the argument that the charges make defendant less of threat, as he is under greater caution to not commit any violation that would lead again to detention. Also, while the nature of the charge is one factor the court may consider in determining dangerousness, defendant argued, it was significant that defendant had no prior criminal history.

¶ 27    As to the State's alleged failure to demonstrate that less-restrictive conditions could not be imposed, defendant reiterated that there was no evidence that, if conditions of release were imposed upon him, he would not comply with court orders. Further, again relying on *Martinez*, defendant noted that any argument that conditions prohibiting the possession of firearms will not mitigate the danger because they were in place all of defendant's life must be rejected because no defendant could ever be released if that argument were accepted. In addition, he urged, the statute seeks to mitigate, not eliminate, any threat or danger. Defendant again proposed several conditions that he believed would adequately mitigate the alleged threat, including EHM and an order: placing him under all standard conditions; barring him from contact with the specific witnesses named by the State (although, again, noting that there was no evidence he ever had any contact with them from the long period between the date of the offense and the date of the arrest warrant); and placing him on the maximum pretrial supervision level.

¶ 28    In response, the State argued that, in addition to the codefendant's statement implicating defendant, there were videos of the people who committed the offense and defendant was identified in the video, such that there was corroboration for defendant's participation in the offense. Next, "obviously, the fact that the defendant did nothing between the time of this offense and the time he was arrested, he had thought he had gotten away with it, and we stand on that argument." Finally, the State reiterated that defendant is young and was not entitled to possess a

firearm, which reflects on dangerousness and his unwillingness to follow rules.   In addition, defendant's youth relates to impulsivity, which makes him much less likely to follow court orders and conditions.

¶ 29   Defendant replied that the codefendant still deflected blame away from himself.   In addition, the State's impulsivity argument was broad and said nothing about this particular defendant.   And while the State speculated as to what defendant may have thought, "that's not clear from the evidence in any manner whatsoever."

¶ 30   The court rejected defendant's arguments and denied the motion for relief.

¶ 31   On March 24, 2025, defendant filed a notice of appeal.   The Office of the State Appellate Defender filed a memorandum on defendant's behalf pursuant to Illinois Supreme Court Rule 604(h)(7) (eff. Apr. 15, 2024).   The State has submitted a memorandum opposing defendant's appeal.

¶ 32                                    II. ANALYSIS

¶ 33   Pretrial release is governed by article 110 of the Code.   725 ILCS 5/110 (West 2022). Under the Code, as amended, all persons charged with an offense are eligible for pretrial release, and a defendant's pretrial release may be denied only in certain statutorily limited situations.   *Id.* §§ 110-2(a), 110-6.1(e).   As relevant here, upon filing a verified petition requesting denial of pretrial release, the State has the burden to prove by clear and convincing evidence that the proof is evident or the presumption great that the defendant has committed a detainable offense (*id.* § 110-6.1(e)(1)), that the defendant's pretrial release poses a real and present threat to the safety of any person or the community (*id.* § 110-6.1(e)(2)), and that no condition or combination of conditions can mitigate that risk (*id.* § 110-6.1(e)(3)).   "Evidence is clear and convincing if it

leaves no reasonable doubt in the mind of the trier of fact as to the truth of the proposition in question." *Chaudhary v. Department of Human Services*, 2023 IL 127712, ¶ 74.

¶ 34 We review *de novo* a detention decision where, as here, the parties relied solely on documentary evidence and no live testimony was presented to the court. *People v. Morgan*, 2025 IL 130626, ¶ 22; *People v. Lopez*, 2025 IL App (2d) 240709, ¶ 18.

¶ 35 On appeal, defendant argues that the detention order must be reversed because (1) a hearing on the State's petition to detain was not held within 48 hours of his first appearance; and (2) the State failed to prove by clear and convincing evidence that (a) he posed a real and present threat, and (b) that the alleged threat could not be mitigated by measures short of detention. We agree with defendant's argument pertaining to the sufficiency of the evidence regarding conditions and, thus, need not address his argument regarding the timing of the hearing.

¶ 36 Specifically, the evidence that defendant posed a real and present threat to Campos, witnesses, or community safety was close. The State contends that the trial court properly considered the statutory factors for dangerousness, including the nature and circumstances of the offense charged and that the crime involved a weapon, as well as the State's arguments concerning the witnesses who could be in danger if defendant were to be released and that defendant was too young to legally own a firearm. The nature of the offense, identity of persons to whom the defendant is believed to pose a threat, and a defendant's access to weapons can be considered in assessing dangerousness (725 ILCS 5/110-6.1(g) (West 2022)). However, while defendant's alleged possession of a weapon should not be taken lightly, the possession allegation was included in the charges against him, and he apparently has *no* other criminal history, let alone a weapons history or other history that would suggest an ongoing threat of danger to the community. The State also suggested that defendant would be a real and present threat to Campos and any other

witness or codefendants, but that suggestion constituted pure speculation and was not based on the evidence. Rather, there was no evidence presented reflecting defendant ever harmed or threatened to harm anyone, nor that he had any contact with these people since the time of the offense. See *People v. Norris*, 2024 IL App (2d) 230338-U, ¶ 41 (the court's finding that the defendant posed a safety risk to a codefendant was only speculation, where nothing in the record reflected that the defendant had threatened or expressed any intent to harm the codefendant). Indeed, the only evidence submitted speaking to defendant's character came in the form of multiple letters of support on his behalf. Defendant is also correct that the absence of any evidence of threats or even contact between him and Campos or his codefendants during the approximately 15-month period between the date of the offense and his arrest is relevant (see *Riaz*, 2023 IL App (1st) 231833-U, ¶ 25), and the State's contention that the lack of contact was simply because he "thought he got away with it" is both speculative and illogical. The allegations reflect that defendant knew who was present during the crime, so there was no particular mystery about who might be able to identify him as a participant had he wished to pressure or threaten them.

¶ 37 In any event, even assuming that the State proved dangerousness, we agree with defendant that the State failed to establish by clear and convincing evidence that no condition or combination of conditions could satisfy the alleged danger. Proper considerations for assessing whether pretrial release conditions would reasonably ensure the safety of a witness and the community include an assessment of "the likelihood of compliance by the defendant with all conditions of pretrial release." 725 ILCS 5/110-5(a)(3)(A)-(B) (West 2022). Here, again, defendant has no criminal history and, thus, no history of failing to obey court orders that would suggest he would not abide by any conditions of release imposed upon him. See, *e.g.*, *Martinez*, 2025 IL App (2d) 240712-U, ¶ 24 ("[g]iven [the defendant's] lack of criminal history, the court could not conclude

that defendant had not previously followed court orders"). The State argues that the court properly considered that defendant was not allowed to possess a firearm because he was underage, yet, he did so anyway, reflecting that imposing a condition that he not possess firearms would be ineffective. However, the assertion that defendant would not follow pretrial release conditions because the charges allege that he already failed to follow the law is an argument akin to one this court rejected in *Martinez*. See *id.* ("[w]e reject the State's suggestion that conditions prohibiting possession of firearms, which were in place all of defendant's life, will not mitigate the danger defendant posed. As defendant argues, no defendant could ever be released if we accepted this argument"). Moreover, although the State argues that the court properly considered that EHM would not prevent defendant from accessing another firearm or committing another felony, there is no indication that defendant would seek another firearm (as he has no criminal history involving firearms), and defendant is correct that the goal is to mitigate risk, not completely eliminate it. *Id.*; see also 725 ILCS 5/110-6.1(e)(3); 5/110-10(b) (court must impose least-restrictive conditions that "mitigate" risk). The evidence was simply not clear and convincing (particularly given defendant's absence of any criminal history) that no combination of conditions short of detention could mitigate the alleged risk.

¶ 38    Given the absence of sufficient evidence that the alleged danger could not be mitigated by conditions of release, we reverse the court's detention order and remand for a hearing to set conditions. We express no opinion on what conditions are appropriate.

¶ 39                                III. CONCLUSION

¶ 40    For the foregoing reasons, the judgment of the circuit court of Kane County is reversed and the cause is remanded.

¶ 41    Reversed; cause remanded.

¶ 42    JUSTICE McLAREN, specially concurring:

¶ 43    While I concur with the majority's decision to reverse the judgement of the circuit court, I write separately to voice my concerns regarding the applicable standard of review. The majority finds the standard of review in the immediate matter to be a mandatory *de novo* review and I find this to be contrary to the clear language of binding precedent. As I recently detailed in my special concurrence in *People v. Mondragon*, the clearest reading of our supreme court's decision in *Morgan* is that the manifest weight of the evidence standard applies to both the circuit court's factual findings and ultimate detention decision under section 110-6.1, but a reviewing court has the option to apply *de novo* review to the factual findings if the detention hearing proceeded solely by proffer. *People v. Mondragon*, 2025 IL App (2d) 250125-U, ¶ 18-39 (McLaren, J., specially concurring).

¶ 44    In the immediate appeal, I submit that under either standard of review, *de novo* review or manifest weight of the evidence, the failure to sustain the burden on review is the same practical quantitative measure. It is a distinction without a difference. I therefore have no problem with using either form of review. I would refer the reader to my special concurrence in *People v. Mondragon*, wherein I relate the following:

> "Some have asserted that in the absence of live testimony, the *Morgan* holding requires a *de novo* review of the detention decision as well as the factual findings that support it. I disagree. The *Morgan* opinion is silent on the standard of review for the ultimate detention decision when the parties proceed by proffer only.
>
> I would argue that the second part of the *Morgan* holding is an exception to the first part. In other words, we are to use the manifest weight of the evidence standard generally, but an exception is carved out for factual findings based solely on proffered evidence. If

that is true, we may conduct a *de novo* review of the factual findings, but should review the ultimate detention decision under the manifest weight of the evidence standard."

*Mondragon*, 2025 IL App (2d) 250125-U, ¶ 31-32 (McLaren, J., specially concurring).

¶ 45  What remains to be seen is when the Illinois Supreme Court reviews a reversal based upon insufficient evidence, which standard of review said court will apply to the reversal and what will be the rationale for choosing that measure of review.