2026 IL App (1st) 260116

FIFTH DIVISION
April 20, 2026

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

No. 1-26-0116B

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 26 CR 19501 |
| | ) | |
| QUADAJAH JOHNSON, | ) | Honorable |
| | ) | Michael R. Clancy, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justice Oden Johnson* concurred in the judgment and opinion.
Presiding Justice Mitchell dissented, with opinion.

**OPINION**

¶ 1    Defendant Quadajah Johnson appeals from the circuit court's order granting the State's petition to detain her before trial pursuant to section 110-6.1 of the Code of Criminal Procedure of 1963 (Code) (Pub. Act 104-417, § 1075 (eff. Aug. 15, 2025) (amending 725 ILCS 5/110-6.1)), commonly known as the Pretrial Fairness Act. We reverse the circuit court's detention order and remand to that court to consider the conditions for Ms. Johnson's pretrial relief.

¶ 2    In the petition for relief she filed in the circuit court, Ms. Johnson argued that the State failed to establish by clear and convincing evidence that the proof was evident or the presumption great that she committed first degree murder, which is the detainable offense she was charged with (see *id.* (amending 725 ILCS 5/110-6.1(a)(1.5)), that she posed a real and present threat to individuals or the community, and that no conditions could mitigate that threat. We agree with Ms.

*Justice Oden Johhnson is not related to defendant Quadajah Johnson

Johnson that the State failed to carry its burden of showing that her release poses such a significant threat that she cannot be released pending trial, with conditions.

¶ 3                                    I. BACKGROUND

¶ 4       On December 3, 2025, Ms. Johnson was arrested and charged with six counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2024)) for shooting and killing Romeca Blackmon, several months earlier. The day after she was arrested, the State filed a petition seeking Ms. Johnson's pretrial detention.

¶ 5       The evidence that the State proffered at the hearing was that, on September 8, 2025, Ms. Johnson was in a relationship with Carlos Smith, the father of her six-month-old child and the child she was pregnant with. Mr. Smith was also the father of Ms. Blackmon's six-year-old son.

¶ 6       Just before 8:30 a.m. on September 8, Mr. Smith drove Ms. Johnson and their baby from his home to Ms. Johnson's car, which was parked nearby. He double-parked his car and the two of them moved their six-month-old from Mr. Smith's car to a car seat in Ms. Johnson's car. Ms. Blackmon had just dropped her child off at a school across the street. Shortly after Ms. Johnson secured her child in the backseat of her car, Ms. Blackmon drove past Ms. Johnson's car, made an immediate U-turn, and stopped with her car double-parked just behind Ms. Johnson's car. This put Ms. Johnson's car between Ms. Blackmon's and Mr. Smith's.

¶ 7       Ms. Blackmon got out of her car and there were words exchanged between her and Ms. Johnson. This confrontation was observed at various points by a number of witnesses, including Mr. Smith.

¶ 8       According to the State, witnesses would describe how Mr. Smith stood between the women and pushed Ms. Johnson away from Ms. Blackmon, who was standing in the open driver's side door of her vehicle. The State reported that evidence would show that one witness called 911 to

2

report a fight between two women and described observing Mr. Smith repeatedly pushing the door of Ms. Blackmon's car shut, hitting her with it. The witness testimony proferred by the State was that Ms. Blackmon then got into her vehicle, and Ms. Johnson approached, threatening Ms. Blackmon. Ms. Blackmon got back out of the car, and Mr. Smith placed her in a chokehold. Ms. Blackmon tried to break free, with her hand in the air. Ms. Johnson threatened to shoot Ms. Blackmon and retrieved a gun from her vehicle. Ms. Blackmon broke free from Mr. Smith and stepped backwards. According to the State's proffer, that was the point at which Ms. Johnson shot Ms. Blackmon several times. According to the State, one witness reported that, after Ms. Johnson shot Ms. Blackmon, Ms. Johnson and Mr. Smith celebrated with a fist bump.

¶ 9 Defense counsel argued that Ms. Blackmon was the aggressor and Ms. Johnson acted in self-defense. Defense counsel advised the circuit court that Ms. Johnson had sought a stalking no-contact order against Ms. Blackmon in December 2024, because Ms. Blackmon was repeatedly calling and text messaging her and her family members and commenting on her social media in a threatening manner. Defense counsel provided the State and the court with a transcript of the hearing held regarding that no-contact order in June of 2025 and explained that Ms. Blackmon threatened Ms. Johnson directly by text, until Ms. Johnson blocked her number and then Ms. Blackmon sent threatening messages to others, including Ms. Johnson's grandmother, in which she said that she was going to kill Ms. Johnson. Ms. Blackmon was present at that June 2025 hearing on the no-contact order but did not make a subsequent appearance, and a default order of protection was issued on July 14, 2025.

¶ 10 Counsel for Ms. Johnson argued that the witnesses at the scene told police that, after Ms. Blackmon got out of the headlock, she rushed at Ms. Johnson's car, with the six-month-old baby inside, and that was when Ms. Johnson shot her. Defense counsel also argued that Ms. Blackmon

3

had boxed in Ms. Johnson's car, by pulling up beside her, when Mr. Smith's car was in front of hers, preventing her from leaving.

¶ 11    On the issue of whether Ms. Johnson posed a threat to the community, defense counsel emphasized that, except for a speeding ticket and a misdemeanor retail theft conviction, for which she received supervision, Ms. Johnson had no criminal background. Ms. Johnson had a valid Firearm Owners Identification (FOID) card and concealed carry license (CCL). She ran her own eyelash business, volunteered in the community, and had just been accepted into a program to become a dental assistant. Ms. Johnson was also the mother of a young baby and had just become pregnant with a second child.

¶ 12    Counsel underscored that Ms. Johnson had sought and obtained a protective order against Ms. Blackmon, that she stayed on the scene and waited for the police, that she cooperated with them, and that the State waited almost three months, or until December 3, 2024, to arrest her.

¶ 13    The court granted the State's petition for pretrial detention.

¶ 14    On December 22, 2025, Ms. Johnson filed a "Motion for Relief Pursuant to Illinois Supreme Court Rule 604(h)." On January 7, 2026, Ms. Johnson filed an amended motion.

¶ 15    At the hearing on the motion, defense counsel provided the court with several exhibits, which are also part of the record on appeal. Defense counsel argued that the video footage showed that the State's witnesses could not have seen or heard as much of the incident as they claimed and that particularly witness three, who was the only witness to report the fist bump, was not in a position to have seen Ms. Johnson after the shooting and did not report this alleged fist bump to the police when she spoke to them initially.

¶ 16    Defense counsel also advised the court that Mr. Smith had reported to the police that Ms. Blackmon approached Ms. Johnson, threatened her and then swung at her. He also reported that

4

Ms. Blackmon told Ms. Johnson, "I told you I was going to catch you," and that Ms. Johnson told Ms. Blackmon: "Leave me alone." Defense counsel pointed to video evidence that showed Ms. Johnson with her hair disheveled when police arrived on the scene, looking as if she had been attacked.

¶ 17    At the hearing on her motion, defense counsel provided the court with the recording of a 911 call that was made regarding this confrontation, from an anonymous caller that reported that the two women were fighting and that Ms. Blackmon was the aggressor.

¶ 18    The State argued that video footage from the officer's body-worn camera after the shooting showed that Ms. Johnson's car had room to drive away. Defense counsel countered that her office had been contacted by an additional witness who saw Mr. Smith start moving his car and that was when Ms. Blackmon charged at and attacked Ms. Johnson and Ms. Johnson shot her. Counsel argued that, based on that witness's testimony, until Mr. Smith moved his car, Ms. Johnson could not have driven away.

¶ 19    At the hearing on Ms. Johnson's Motion for Relief, the State reiterated the proffer that it had made at the initial detention hearing. The State also noted that the default order of protection was never served on Ms. Blackmon so, while she knew Ms. Johnson was seeking an order of protection, she may not have known one had been entered when she stopped her car and approached Ms. Johnson, which would have violated that order. The State also noted that an additional witness, not included in the previous proffer, would support the State's characterization that Ms. Johnson was the aggressor.

¶ 20    The court denied Ms. Johnson's Motion for Relief. It noted that Ms. Johnson was alleged to have shot Ms. Blackmon in broad daylight, near a school. The court emphasized that, except for Mr. Smith, whom it did not believe was "an independent witness," none of the other proffered

witnesses had reported seeing Ms. Blackmon ever striking Ms. Johnson, and they were all consistent in saying that Ms. Blackmon appeared unarmed throughout the incident. The court stated that it recognized Ms. Johnson "seems to have led a law-abiding life" but the facts of the incident nevertheless indicated that she posed a real and present threat to the eyewitnesses and to the community at large, which no conditions could mitigate.

¶ 21    Ms. Johnson filed a notice of appeal on January 8, 2026.

¶ 22                                    II. JURISDICTION

¶ 23    Ms. Johnson's petition for relief was denied on January 8, 2026, and she timely filed a notice of appeal that same day. We have jurisdiction over this appeal under section 110-6.1(j) of the Code (Pub. Act 104-417, § 1075 (eff. Aug. 15, 2025) (amending 725 ILCS 5/110-6.1(j))) and Illinois Supreme Court Rule 604(h) (eff. Apr. 15, 2024), which govern appeals from orders denying the pretrial release of a criminal defendant.

¶ 24                                    III. ANALYSIS

¶ 25    Under the Pretrial Fairness Act: "All defendants shall be presumed eligible for pretrial release." Pub. Act 104-417, § 1075 (eff. Aug. 15, 2025) (amending 725 ILCS 5/110-6.1(e)). To overcome this presumption, the State must seek pretrial detention by filing a timely, verified petition. *Id.* (amending 725 ILCS 5/110-6.1(a), (c)).

¶ 26    Once the State has filed a petition, a defendant can be detained pending trial only where the State shows by clear and convincing evidence that (1) "the proof is evident or the presumption great" that the defendant committed a qualifying offense, (2) based on the facts of the case, the defendant "poses a real and present threat to the safety of any person or persons or the community," and (3) "no condition or combination of conditions" provided in section 110-10(b) of the Code can mitigate either that safety risk or "the defendant's willful flight." *Id.* (amending 725 ILCS

5/110-6.1(e)(1)-(3)).

¶ 27    Where, as in this case, the circuit court made its detention decision without hearing live testimony, we are not bound by that court's factual findings and should make our own *de novo* determination of whether the State has met its burden on each of the statute's three requirements. *People v. Morgan*, 2025 IL 130626.

¶ 28    The Pretrial Fairness Act presumes that pretrial release is available for all charged crimes, including murder. See, *e.g.*, *People v. Robinson*, 2025 IL App (2d) 250123-U (reversing pretrial detention and calling the suggestion that a murder defendant posed a threat to witnesses "pure speculation" where there were no threats or contact of any kind between defendant and witnesses during the 15-month period between the offense and arrest); *People v. Thomas*, 2025 IL App (4th) 251082-U (caretaker who knowingly administered a lethal dose of medication to a child to be released because conditions could mitigate "the very specific nature" of the danger she posed); *People v. McCann*, 2024 IL App (1st) 240892-U (defendant accused of shooting her former lover at close range under disputed circumstances did not pose significant threat to anyone else); *People v.McDonald*, 2024 IL App (1st) 232414 (defendant accused of shaking his baby to death entitled to release where there were no other children he would be responsible for).

¶ 29    As these cases reflect, even in murder cases, a criminal defendant is to be released pending trial unless the State has shown that the charged defendant "poses a real and present threat" to the safety of any person or to the community, such that no condition could mitigate the safety risk. Because we find that the State failed to carry its burden of making this showing as to Ms. Johnson, we remand to the circuit court to consider the appropriate conditions for release.

¶ 30    The specific factors that courts are directed to consider in assessing whether a defendant awaiting trial poses a threat are as follows:

"(1)     The nature and circumstances of any offense charged, including whether the offense is a crime of violence, involving a weapon, or a sex offense.

(2)     The history and characteristics of the defendant including:

(A)     Any evidence of the defendant's prior criminal history indicative of violent, abusive, or assaultive behavior, or lack of such behavior. Such evidence may include testimony or documents received in juvenile proceedings, criminal, quasi-criminal, civil commitment, domestic relations, or other proceedings.

(B)     Any evidence of the defendant's psychological, psychiatric or other similar social history which tends to indicate a violent, abusive, or assaultive nature, or lack of any such history.

(3)     The identity of any person or persons to whose safety the defendant is believed to pose a threat, and the nature of the threat.

(4)     Any statements made by, or attributed to the defendant, together with the circumstances surrounding them.

(5)     The age and physical condition of the defendant.

(6)     The age and physical condition of any victim or complaining witness.

(7)     Whether the defendant is known to possess or have access to any weapon or weapons.

(8)     Whether, at the time of the current offense or any other offense or arrest, the defendant was on probation, parole, aftercare release, mandatory supervised release, or other release from custody pending trial, sentencing, appeal, or completion of sentence for an offense under federal or State law.

(9)     Any other factors, including those listed in Section 110-5" 725 ILCS 5/110-6.1(g)

8

(West 2024).

¶ 31    We look first, under the statute, to the nature and circumstances of the crime. While Ms. Johnson has been charged with an extremely serious and violent crime, this alleged crime was the culmination of a very personal and specific controversy. There are undisputed facts about this confrontation that undermine any claim that Ms. Johnson remains a danger to the community. It is undisputed that Ms. Johnson did not seek out this confrontation. Rather, the victim confronted her. It is also not disputed that, prior to this confrontation, Ms. Johnson sought and obtained a protective order, a legal and appropriate path for avoiding any violent confrontation. It is undisputed that Ms. Johnson remained at the scene and cooperated with the police, and it is undisputed that Ms. Johnson had both a FOID card and a concealed carry license.

¶ 32    In many murder cases, the nature of the crime itself provides strong evidence that the defendant presents a danger to the community or to other specific people. In a case involving a murder incidental to a violent crime, gang activity, domestic violence, a mental health crisis, or a random act, it is a relatively straightforward line from the State's proffer of the expected trial evidence to a showing that the defendant is a danger to the community. However, this case is different because the alleged crime grows directly out of the relationship between these two women. The fact that Ms. Johnson sought and received a no contact order against Ms. Blackmon underscores the isolated nature of this conflict. Also, in this case the fact that this defendant had a history of adhering to all legal requirements, and the fact that there is nothing in her background to suggest any propensity for violent, abusive, or assaultive behavior, undermine any claim that her release would pose a threat to others.

¶ 33    We look next to the history and characteristics of Ms. Johnson, herself. Her only criminal history is for a nonviolent misdemeanor. The State presented no evidence to suggest that Ms.

Johnson has a mental health history or social history that reflects a danger to the community. Ms. Johnson's physical condition is that she is pregnant. While her pregnancy certainly does not preclude violent actions on her part, its progression may well limit her ability to engage in them.

¶ 34     We also find it persuasive that Ms. Johnson remained at the scene until police arrived and fully cooperated with them. In addition, although these events all occurred on September 8, 2025, Ms. Johnson was not arrested until December 3, 2025. Thus, for almost three months she remained out of custody but in touch with police as they continued to investigate this case. This fact also demonstrates that she had not posed then, and likely will not pose if released, a threat to the other witnesses involved in this case, as the circuit court suggested she might.

¶ 35     We also find this to be a case where conditions could be imposed that would mitigate against any possible threat, and we remand to the circuit court for consideration of those conditions. Very significant to us is the fact that Ms. Johnson had both a FOID card and a concealed carry license for the gun that she used. This suggests that she would adhere to a court order banning her possession or use of any firearms, which surely would be a condition of her release. For those defendants who have been arrested and are awaiting trial for offenses involving illegal gun possession, a ban on the possession of firearms is often viewed as an ineffectual condition of release. However, for Ms. Johsnon, who it appears from the record has never owned a gun illegally, this is a condition that could and should militate strongly against any threat.

¶ 36     Finally, we note that there is an additional consideration in this case, because, if the detention order remains in place, Ms. Johnson could have to give birth while in jail. Before the Pretrial Fairness Act was enacted, a separate 2019 provision in the bail statute required a hearing before any pretrial defendant was required to give birth in custody. 725 ILCS 5/110-5.2 (West 2019). That provision, currently provides that "It is the policy of this State that a pre-trial detainee

10

shall not be required to deliver a child while in custody absent a finding by the court that continued pre-trial custody is necessary to alleviate a real and present threat to the safety of any person or persons or the community." 725 ILCS 5/110-5.2 (West 2024).

¶ 37    The trial court, citing this section of the statute, suggested that Ms. Johnson's pregnancy would require renewed consideration of whether Ms. Johnson should remain in custody as her due date approaches. However, for the reasons outlined above, we believe that Ms. Johnson should be released sooner, rather than later, to prepare for and give birth to her baby, and to prepare with her counsel for trial.

¶ 38    Our dissenting colleague suggests that we fail to appreciate the dangerous situation created by Ms. Johnson's firing shots on a public street with children around, when she shot Ms. Blackmon on September 8 of last year. Of course we do and that may well be an appropriate consideration at trial. But that is not the question now. Rather the question under the Pretrial Fairness Act is whether Ms. Johnson would be such an *ongoing* threat to public safety that she must remain in custody while she awaits that trial.

¶ 39    Trial will also be the right time to choose between the competing narratives of the confrontation between Ms. Johnson and Ms. Blackmon. The dissent paints Ms. Johnson as the clear aggressor, motivated by jealousy or anger at a romantic rival, rather than by fear for herself and her six-month-old child. We have briefly laid out some of the contrary evidence in our recitation of the facts and we recognize that it will be up to the trier of fact—not us—to decide if this was murder or self-defense.

¶ 40    Finally, the dissent cites *People v. Gage*, 2026 IL App (1st) 252526-U and *People v. Martinez,* 2025 IL App (1st) 250298-U, as support for its suggestion that this court is asking the trial court to do the impossible in remanding to determine what conditions should be imposed on

Ms. Johnson's release to protect the community. Those cases are, of course, totally different. Ms. Gage was already on pretrial release in another case when she was arrested in the case cited. Neither of these defendants waited for the police to arrive, cooperated fully with them and were released for several months following the shooting. These very different facts in Ms. Johnson's case suggest that she will fully comply with whatever conditions of release are imposed including, but not limited to, possessing no firearms, a condition that we direct the circuit court to include. We trust that the trial court will be in the best position to decide which other conditions are feasible, fair and protective.

¶ 41                                    VI. CONCLUSION

¶ 42    For the above reasons, we reverse the circuit court's order granting the State's petition for pretrial detention and remand with directions to the circuit court to determine the conditions of Ms. Johnson's release.

¶ 43    Reversed and remanded.

¶ 44    PRESIDING JUSTICE MITCHELL, dissenting:

¶ 45    The suggestion that the murder of a romantic rival is "a very personal and specific controversy" with no bearing on public safety is a dangerous fiction. It mistakes personal motive for narrowness of risk: that defendant has *already* killed her victim does not support the conclusion that she no longer presents "a real and present threat" to the community. Pub. Act 104-417, § 1075 (eff. Aug. 15, 2025) (amending 725 ILCS 5/110-6.1(e)(2)).

¶ 46    Our defendant gunned down her victim on a busy street in Chicago's South Loop shortly after 9:00 a.m. on a weekday morning. What began as a verbal altercation quickly escalated and was witnessed by passersby. The incident took place in proximity to a school where the victim had just dropped off her six-year-old child, a child fathered by Carlos Smith, who also fathered

defendant's six-month-old child (also on scene). According to a witness account, Smith struck the victim with her own car door repeatedly and then had her in a chokehold while defendant went to her car to retrieve her 9-millimeter handgun. The victim broke free from Smith and backed away. Defendant then walked toward the victim, who was unarmed, fired a shot, paused, and then fired two more shots. And with that, defendant and Smith fist-bumped.

¶ 47    What does this crime say about public safety? It says that when confronted with the ordinary conflict inherent in human relations, defendant extinguished a life. And defendant did so *despite* her firearm training and lawful licensing and *despite* her past willingness to abide by the law. This killing was not merely intentional and avoidable violence, but it is violence unmoored from proportion and restraint. Defendant chose to resolve her grievance not through withdrawal, dialogue, or legal process, but through destruction of her rival. That choice is revealing. It demonstrates a willingness to answer human conflict—common, recurring, and unavoidable—with lethal force. Public acts of deadly violence demonstrate not just a willingness to kill, but a willingness to do so without regard for surroundings, bystanders, or collateral consequences. A defendant who has crossed that threshold once cannot be assumed to pose no danger of crossing it again.

¶ 48    The condition prompting the shooting—an argument—can and will arise again. There is no natural boundary confining that risk to a single victim. Further, in the pretrial period, an accused undoubtedly faces enormous stress: the prospect of conviction and a lengthy criminal sentence, the pressure of court proceedings, and concerns about witnesses and how they might testify. These circumstances underscore that the risk posed by defendant is ongoing and not confined to a single, now-deceased victim.

¶ 49    My esteemed colleagues in the majority elevate defendant's lack of prior violent history to near-controlling status. That is legal error. The statute lists criminal history as one factor among many. See *id.* (amending 725 ILCS 5/110-6.1(g)(1)-(9)). The statute certainly does not confer a get-out-of-jail-free card on first-time offenders accused of serious violent crimes. Indeed, the absence of a prior violent criminal history in this case does not negate the significance of the crime charged, but rather magnifies it by making the crime more inexplicable and defendant's conduct seemingly more unpredictable.

¶ 50    The majority disregards facts that firmly establish defendant's dangerousness. Defendant brought a gun to an argument with an unarmed victim, and the confrontation ended with defendant unharmed and her victim dead with gunshots to her face and leg. And all this happened on a busy city street in proximity to a school—a fact that is not in dispute. Astonishingly, the majority declares "that may well be an appropriate consideration at trial," but not when evaluating the risk posed to the community in a pretrial detention hearing. That conclusion constitutes unmistakable legal error.

¶ 51    Further, the majority's confidence in largely unspecified conditions for release is misplaced. Electronic monitoring cannot prevent murder. See, *e.g.*, *People v. Simpson*, 2024 IL App (4th) 240607-U, ¶ 40 (explaining that "[e]lectronic monitoring, regardless of the speed at which law enforcement can be notified of a violation," does not "provide much in the way of *prevention*" (emphasis in original)); see also *People v. Weyrick*, 2022 IL App (3d) 200098-U, ¶¶ 4, 16, 19, 40 (recounting that the defendant committed first degree murder while wearing a GPS ankle monitor). Firearm prohibitions can scarcely restrain an individual who, according to the State's proffer, resorted to lethal force in a matter of moments. See, *e.g.*, *People v. Gage*, 2026 IL App (1st) 252526-U, ¶¶ 28-29 (determining that no conditions would mitigate the threat the

defendant posed to anyone who triggered defendant's temper where "defendant shot her friend after a dispute about doing the dishes"). Geographic restrictions cannot anticipate confrontations that might arise. See, *e.g.*, *People v. Martinez*, 2025 IL App (1st) 250298-U, ¶ 38 (rejecting GPS monitoring and agreeing with the State that "no condition short of detention would prevent [the defendant] from having the 'ability and opportunity to act on an impulse to engage in violent behavior toward a member of the community and retaliate with deadly force after the individual retreats' "). In granting the State's petition to detain, the circuit court recognized the hard truth: some risks are not meaningfully reduced through conditions.

¶ 52     If these facts—multiple gun shots on a busy street, an unarmed victim left dead, and a celebratory fist bump—do not constitute clear and convincing evidence of a real and present threat, then the statutory standard has been rendered meaningless. The Pretrial Fairness Act does not require courts to wait for a second dead body before recognizing that a defendant "poses a real and present threat" to the community.

¶ 53     For these reasons, I would affirm the order of detention. Accordingly, I respectfully dissent.

---

### *People v. Quadajah Johnson*, 2026 IL App (1st) 260116B

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 26-CR-19501; the Hon. Michael R. Clancy, Judge presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Ari Williams of Ari Williams Law, LLC, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (Joan F. Frazier, Special Assistant State's Attorney, of counsel), for the People. |

---